UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

|  |  |  |
|---|---|---|
| JANE Z. CAO, as personal representative of the Estate of XIANQING CAO, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:03-cv-289 |
| v. | ) ) | Honorable Robert Holmes Bell |
| U.S. SECRET SERVICE, et al., | ) ) | |
| Defendants. | ) ) | **OPINION** |

Plaintiff Jane Z. Cao filed this lawsuit on April 30, 2003, purporting to bring action *in pro per* as personal representative of the Estate of Xianqing Cao and on her own behalf. Xianqing Cao died on May 2, 2001, after a gun battle with police. Plaintiff contends that Mr. Cao's death resulted from a global conspiracy spanning a period of years and involving numerous individuals and foreign countries. Plaintiff's complaint consists of 487 paragraphs covering 114 pages, to which plaintiff has incorporated or appended numerous photographs, documents, and official records. Plaintiff's complaint named nineteen defendants:

1. United States Secret Service;
2. John Doe I;
3. John Doe II;
4. Portage Police Department;
5. Jack Bogema;
6. Michelle Kozminske;[1]

---

[1] Plaintiff's complaint misspelled the last name of defendant Michelle Kozminske as "Kozminski." The correct spelling is utilized throughout this opinion and the court's accompanying order.

7.      Gregory Burke;
8.      Matthew Scott Barkley;
9.      Kalamazoo County Sheriff's Department;
10.     Marty Johnson;
11.     Ken Jako;
12.     Kalamazoo County Family Independence Agency;
13.     Don Smith;
14.     Nicole Erickson;
15.     Heather Hain;
16.     James J. Gregart;
17.     Carrie L. Klein;
18.     Cheryl Carlsen; and
19.     Beth Dawson.

Plaintiff's complaint seeks monetary damages and injunctive relief.

The matter is before the court upon a motion to dismiss for lack of subject-matter jurisdiction and for failure to state a claim by the United States Secret Service and Does I and II (docket # 45); Rule 12(b)(6) motion to dismiss by defendants Kalamazoo County Sheriff's Department, James A. Gregart, Ken Jako, Marty Johnson, and Carrie Klein (docket # 22); and motions to dismiss or for summary judgment by defendants Matthew Scott Barkley, Jack Bogema, Gregory Burke, Michelle Kozminske and the Portage Police Department. (docket # 38). Upon review, defendants' motions to dismiss will be granted. The pending motion for summary judgment will be dismissed without prejudice.

## **Applicable Standards**

### **1.**

The United States has moved to dismiss certain claims under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction. Federal courts are courts of limited jurisdiction which may exercise only those powers authorized by Constitution and statute. *Kokkonen v. Guardian Life Ins.*

*Co. of Am.*, 511 U.S. 375, 377 (1994).  Therefore, "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (citations omitted). The first and fundamental question presented by every case brought to the federal courts is whether it has jurisdiction to hear a case, even where the parties concede or do not raise or address the issue.  *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) .  "Quite aside from whether the parties raise jurisdictional issues themselves--or even attempt to consent or agree to federal jurisdiction--federal courts have an independent obligation to investigate and police the boundaries of their own jurisdiction." *Douglas v. E.G. Baldwin Assoc., Inc.*, 150 F.3d 604, 606 (6th Cir. 1998).

Plaintiff has the burden of proving this court's subject-matter jurisdiction. *See Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002); *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990); *see also Phillips v. Lansing Sch. Dist.*, No. 03-1898, 2004 WL 473992, at * 1 (6th Cir. Mar. 10, 2004); *Hehl v. City of Avon Lake*, No. 02-3406, 2004 WL 133875, at * 3 (6th Cir. Jan. 20, 2004).  "Specifically, the plaintiff must show that the complaint alleges a claim under federal law, and that the claim is 'substantial.'" *Michigan Southern R.R. Co. v. Branch & St. Joseph Counties Rail Users Ass'n, Inc.*, 287 F.3d 568, 573 (6th Cir. 2002); *see Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996).  Mere reference to a federal statute does not establish federal jurisdiction.  *Michigan Southern*, 287 F.3d at 574. Likewise, "the plaintiff, as the party invoking federal subject matter jurisdiction, has the burden of persuading the court that all the requirements necessary to establish standing to bring the lawsuit have been met." *Courtney v. Smith*, 297 F.3d 455, 459 (6th Cir. 2002) (citing *Lujan v. Defenders of Wild Life*, 504 U.S. 555, 561 (1997)).

-3-

The federal defendants' motion seeks dismissal pursuant to Fed. R. Civ. P 12(b)(1). The Sixth Circuit recognizes two types of 12(b)(1) motions: a "facial" attack challenging the sufficiency of the plaintiff's factual allegations, in which all well-pleaded factual allegations in the complaint are taken as true; and a "factual" attack challenging the actual fact of subject-matter jurisdiction, which is analyzed under Fed. R. Civ. P 56 standards.  *See Ohio Nat'l Life Ins. Co. v. United States*, 922 F.3d 320, 324 (6th Cir. 1990); *see also Nichols v. Muskingum College*, 318 F.3d 674, 677 (6th Cir. 2003).  The difference is often significant, because under a factual challenge the district court is empowered to weigh the evidence, and no presumptions apply as to the truthfulness of plaintiff's allegations.  *See United States v. A.D. Roe Co.*, 186 F.3d 717, 721-22 (6th Cir. 1999). The Sixth Circuit has clearly recognized that a district court is empowered consider evidence beyond the pleadings and to resolve factual disputes when necessary to resolve challenges to subject-matter jurisdiction under Rule 12(b)(1).  *See Madison-Hughes v. Shalala*, 80 F.3d 1121, 1130 (6th Cir. 1996); *RMI Titanium Co. v. Westinghouse Elec. Co.*, 78 F.3d 1125, 1133-34 (6th Cir. 1996); *compare United States v. Bell South Telecomm., Inc.*,  123 F.3d 935, 937 (6th Cir. 1997).

**2.**

Other defendants have moved to dismiss the complaint for failure to state a claim. Under Rule 12(b)(6), a complaint may be dismissed only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint.  *See Ludwig v. Board of Trustees*, 123 F.3d 404, 408 (6th Cir. 1997);  *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12  (6th Cir. 1987).  The court must construe the complaint in the light most favorable to plaintiff, accept all factual allegations as true, and determine whether it is established beyond a

doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.  *See Montgomery v. Huntington Bank*, 346 F.3d 693, 698 (6th Cir. 2003);  *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003).  While the standard is decidedly liberal, it requires more than the bare assertion of legal conclusions.  *See Perry v. American Tobacco Co.*, 324 F.3d 845, 848 (6th Cir.2003).  Courts are not required to conjure up unpleaded allegations.  *See Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989); *Perry v. United Parcel Servs.*, No. 03-5861, 2004 WL 193203, at * 1 (6th Cir. Jan. 30, 2004).  The court need not accept as true legal conclusions or unwarranted factual inferences.  *See Booker v. GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003); *Gahafer v. Ford Motor Co.*, 328 F.3d 859, 861 (6th Cir. 2003) (quoting *Morgan,* 829 F.2d at 12); *see also Friedler v. Equitable Life Assurance Society of the U.S.*, No. 02-3800, 2003 WL 23172051, at * 2 (6th Cir. Dec, 24, 2003).  *Pro se* pleadings are held to a less stringent standard than formal pleadings drafted by licensed attorneys.  *See Haines v. Kerner*, 404 U.S. 519 (1972).  However, even the lenient treatment generally given *pro se* pleadings has its limits.  *See Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991).  "In practice, a '. . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" *Allard v. Weitzman (In re DeLorean Motor Co.)*, 991 F.2d 1236, 1240 (6th Cir. 1993); *see Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003); *see also Gilmore v. Corrections Corp. of Am.*, No. 03-5836, 2004 WL 237417, at * 2 (6th Cir. Feb. 6, 2004).

Plaintiff elected to attach exhibits to her complaint in support of the complaint.  Those exhibits have been considered by the court in evaluating defendants' motion to dismiss, but have not converted the defendants' motion to dismiss into a motion for summary judgment.  *See* FED. R. CIV. P. 10(c); *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001)("'In determining whether to

grant a Rule 12(b)(6) motion, the court primarily considers the allegations of the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.'") (quoting *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997)); *see also Easy Way, Inc. v. Transport Int'l Pool, Inc.*, No. 01-2411, 2003 WL 21259677, at * 2 (6th Cir. May 27, 2003); *Backer v. Manning Family Trust (In re Backer)*, No. 01-5312, 2002 WL 31388769, at * 7-8 (6th Cir. Oct. 22, 2002); *Thomas v. Publishers Clearing House, Inc.*, No. 00-3948, 2002 WL 193935, at * 2 (6th Cir. Feb. 5, 2002).

### Allegations of Plaintiff's Complaint

1.    Xianqing Cao's Prior Criminal Convictions Upon Firearm Offenses and His
    Post-Conviction Release in Michigan

On January 31, 2001, Xianquing Cao was convicted in Washington, D.C. of two counts of possession of an unregistered firearms and attempted carrying of a pistol without a license. Mr. Cao received concurrent sentences of 180 days on each count with execution of the sentences suspended.  Mr. Cao was placed on probation, which included conditions that Mr. Cao was to continue mental health treatment, that he not carry any weapons, and he was prohibited from entering into the area within a two block radius of the White House.  (¶ 143).  Mr. Cao's probation was transferred to Michigan.  (¶ 144).  Plaintiff does not purport to challenge Mr. Cao's criminal convictions in this lawsuit, nor could she.  However, Xianquing Cao's criminal convictions and his post-conviction supervision in Michigan provide the backdrop against which plaintiff presents her conspiracy allegations against the United States Secret Service and John Does I & II.  Therefore, they must be examined in some detail.

2.    Mr. Cao's August 2000 trip to Washington, D.C.

On June 15, 2000, Mr. Cao traveled from Michigan to Washington, D.C., apparently as some sort of private effort on his part towards "the peaceful unification of Mainland China and Taiwan."  Plaintiff did not accompany her husband on this trip.  (¶¶ 5-7).  On June 18, 2000, Jim Hitchcock, a United States Secret Service agent, called plaintiff and advised her that Mr. Cao was with him.  Plaintiff alleges that on or about June 18, 2000, Agent Hitchcock took a pellet gun from Mr. Cao, which he failed to return.  (¶¶ 7-10).  Plaintiff alleges that on June 27, 2000 Secret Service agents attempted to contact Mr. Cao at his Michigan address by telephone.  Plaintiff states that on or about July 8, 2000, Mr. Cao purchased a handgun, purportedly to replace the pellet gun taken by Agent Hitchcock.  (¶¶ 12-14).

3.    Plaintiff and Xianqing Cao's September 2000 Trip to Washington, D.C.

Sometime prior to September 24, 2000, Xianqing Cao had convinced plaintiff that he was a friend of President Clinton and advised plaintiff that he needed her service as an English-Chinese translator.  Plaintiff decided to travel to Washington, D.C. with Mr. Cao.  On September 24, 2000, Mr. and Mrs. Cao checked into the Hyatt Hotel in Arlington, Virginia.  (¶¶ 28-34).  The next morning the couple drove a van up to the White House mail stop, where they purportedly sent gifts to President Clinton and his family.  A policeman sent a security officer over to question the couple.  Mr. and Mrs. Cao were questioned at that time, but were not detained.  (¶¶ 35-36).

Plaintiff alleges, "Xianqing Cao wanted to meet President Clinton to prevent imminent war and the loss of many innocent American lives.  Xianqing found some secrets and he could help prevent the massive tragedy.  Xianqing Cao could tell the secrets only to President

-7-

Clinton." (¶ 38).  Secret Service Agents Edward Kolshorn and Tim Wood advised Mr. and Mrs. Cao

that the Caos could attempt to arrange a meeting with the President through the Chinese Embassy

or through a "state congressman."  (¶¶ 39-40).  Paragraph 41 of the complaint alleges:

> Intended to share the responsibility to the future possible loss of many innocent American
> lives, Jane Cao obtained both signatures of Agent Kolshorn and Agent Wood in Jane Cao's
> day planner for not helping Xianqing meet President Clinton.  (¶ 41).

Representatives of the Chinese embassy declined  to help Xianqing meet President Clinton.  (¶ 43).

On September 26, 2000, John Podesta's secretary advised Mr. and Mrs. Cao that a meeting with the

President "would not be arranged."  (¶ 47).

### 4.    Xianqing Cao's Purchase of a Second Gun and his October - November, 2000 Trip to Washington, D.C.

On October 4, 2000, Xianqing Cao purchased another handgun. (¶ 54).  According

to plaintiff, "Xianqing Cao wanted to resume his 50-feet target shooting training.  He wanted to be

prepared for being called upon to rescue hostages including a few westerners and USA citizens in

Phillipine[s] and for anti-terrorism war.  He also liked this hobby and competition of target shooting

besides taking care of the children at home." (¶ 53).  Plaintiff states that at approximately 7 p.m. on

October 31, 2000, Xianqing Cao told plaintiff that he was going to Washington, D.C. and drove

away.  Late in the evening on November 1, 2000, Mr. Cao returned to his home in Portage, Michigan

stating that he had been to the Chinese Embassy, but that his request for a translator had been denied.

(¶¶ 58-59).

### 5.    Correspondence with the White House by Mr. and Mrs. Cao

During the weeks and months before his December 2000 arrest in Washington, D.C.

and subsequent criminal convictions, Mr. Cao, with assistance from plaintiff, had sent a series of

written communications to the White House by letter, fax, and e-mail.  For example, in a September

11, 2000 fax Mr. Cao volunteered to rescue the American and European hostages being held in the

Philippines.  (¶ 25).  The same fax offered the following introduction:

> Xianqing wants me to tell you the following contents so you would know who he is:
>
>> He directed the rescue of about 200 passengers in an airplane hijacking incident in India right before Christmas, 1998.
>>
>> He commanded the US army to crack down the illegal drug maker in the USA that produced 1/3 supply of illegal drugs.
>>
>> Also, through personal contacts, President Clinton and Xianqing became friends.
>>
>> We moved from Connecticut to Michigan in 1999. . . . (Xianqing lost his phone book along with President Clinton's personal number because of the move.)

(¶ 25).  On September 21, 2000, Mr. Cao sent an e-mail to President Clinton stating that he wanted

to meet with the President and personally thank him for granting permanent normal trade relations

between USA and China.  (¶ 26).  Mr. Cao provided the President with his recommendations on how

to avoid war over Taiwan and how to achieve peace in the Middle East.  (¶ 60).  On November 30,

2000, Mr. Cao offered to act as a witness for President Clinton in court to the effect that there had

been "cheating on the presidential ballots in Florida."  (¶ 63).

6.    <u>Xianqing Cao's December 2000 Trip to Washington, D.C.</u>

On November 20, 2000, Xianqing Cao purchased a third handgun.  (¶ 62).  On

December 5, 2000, Mr. Cao left Portage, Michigan, and headed to Washington, D.C.  Prior to his

departure, Mr. Cao stated that he wanted to have Taiwan and Mainland China sign an agreement for

peaceful unification by the end of the year and have President Clinton witness the signatures.  (¶ 65).

-9-

On December 7, 2000, Xianqing Cao packed his three handguns and other personal belongings into his car and drove to Washington, D.C.  (¶ 70).  Plaintiff parked his car near the Washington Monument and walked to the White House.  (¶ 77).

On December 8, 2000, at approximately noon, Xianqing Cao walked up to the guard house at the White House in Washington, D.C. and asked to meet with President Clinton.  (¶ 73).  According to plaintiff, Mr. Cao had a stick and a rope with him at the time he asked to see the President.  (¶ 83).  Plaintiff's complaint quotes at length from the criminal complaint filed against Xianqing Cao.

> At approximately 1200 on 12/8/00 Defendant appeared the tour line at the White House . . . and stated that he needed to see the President.  Officer Himes called for assistance, and the defendant was spoken to by Secret Service Agent Ken Werley.  Defendant stated that he had a previous appointment with the [President], missed it, and was there to apologize for not appearing.  Defendant also stated that he became friends with the President when he assisted in a rescue of a hijacked airline[r] in India.
>
> Defendant was asked if he had any weapons on him, he stated no, but through non-verbal communication implied that there were weapons in his car [in the] Washington Monument parking lot.  Defendant signed a consent to search his car, and one handgun was found in the glove box, this gun was loaded and appeared to be in operable condition.  Two additional handguns were found in the trunk with 5000 rounds of ammo.
>
> Defendant was arrested and taken to the Secret Service field office.  Defendant was explained his constitutional rights [through] an interpreter who [was] a F.B.I. agent.  Defendant again stated that he was there to speak with the President and had driven from Michigan with the guns.
>
> Defendant appeared to have difficulty speaking the English language, but appeared to understand Agent Werley.
>
> Defendant ha[d] been to the White House on two prior occasions, and spoken to by the Secret Service.  Defendant appeared to have some type of mental deficiency, because of his delusional statements and his conduct.

-10-

(¶ 92).  Xianqing Cao received a court-ordered competency examination and mental health treatment.

(¶¶ 102, 103, 130, 131, 142).

Plaintiff called Secret Service Agent Ken Werley on December 11, 2000.  Agent

Werley asked plaintiff what Mr. Cao's "top secret was."  (¶¶ 97-98).  Plaintiff replied that Xianqing

Cao told her that he had "found a top secret," that many innocent American lives would be lost, and

that he could not tell the secret to anyone other than President Clinton, because if he did, the Cao

family would be killed.  (¶ 99).  Plaintiff alleges further contact with Agent Werly on December 15,

2000.

126    On December 15, 2000, Jane Cao talked with Agent Werley on the phone.  She
       pleaded with him to drop [the] charge again[st] Xianqing Cao because he had MI
       [Michigan] licenses for his three guns locked in his car and his request for meeting
       President Clinton to save innocent lives and prevent war [which] was not a crime.
       Agent Werley replied he was right [in] charging Xianqing Cao.

127    Jane Cao told Agent Werley: If what Xianqing Cao [] said was true – if there was
       loss of many innocent American lives and if US was in war in the near future, Agent
       Werley should be feeling guilty.

(¶¶ 126-27).

Secret Service Agents Patrick Hogan and Stuart Allison visited plaintiff on January

2, 2001.  Plaintiff agreed to give a statement and attempted to explain how the rope and stick related

to Xianqing's apology to the President and how Mr. Cao ended up in Washington, D.C. with three

handguns. (¶ 137).

On or about January 25, 2001, a psychologist offered an opinion that Mr. Cao was

competent to stand trial.  Mr. Cao had been diagnosed as having a "Psychotic Disorder, NOS" and

was being treated with medication.  (¶ 142).  On January 31, 2001, Mr. Cao was convicted in

Washington, D.C. of two counts of possession of an unregistered firearms and attempted carrying

of a pistol without a license.  Mr. Cao received concurrent sentences of 180 days on each count with execution of the sentences suspended.  Mr. Cao was placed on probation which included conditions that Mr. Cao was to continue mental health treatment, was not to carry any weapons and was not allowed within a two block radius of the White House.  (¶ 143).  Mr. Cao's probation was transferred to Michigan.  (¶ 144).

    7.  <u>Post-Conviction Supervision of Xianqing Cao</u>

   Following his January 31, 2001 convictions in Washington, D.C., Mr. Cao's probation was transferred to Michigan.  (¶ 144).  He returned to Portage, Michigan on February 1, 2001.  (¶ 145).  On or about March 20, 2001, after reading an article about a Chinese military officer who had betrayed China, Xianqing Cao stated to Mrs. Cao that he would soon be assassinated.  (¶ 155).

   On March 27, 2001, President Bush was scheduled to visit Kalamazoo, Michigan. (¶ 172).  On March 25, 2001, two secret service agents (John Doe I and John Doe II) rang the doorbell of the Cao residence.  Mr. Cao opened the door for the officers when they flashed their credentials.  The agents asked Mr. Cao about his mental health treatment.  (¶ 161).  John Doe I allegedly asked Mrs. Cao to leave her pistol with the Portage Police Department.  Mrs. Cao declined to hand over her gun.  Mrs. Cao did show the agents her gun which she stated was kept in a locked briefcase in her basement.  (¶¶ 164-68).  Plaintiff alleges that she subsequently left the briefcase unlocked "because of the distraction from answering John Doe I's inquiries."  (¶ 169).  Plaintiff's Probation Agent, Robert Ruekert of the Michigan Department of Corrections, made a probation office visit appointment for Mr. Cao on the date of President Bush's visit.  (¶¶ 173-74).

Mrs. Cao alleges that in mid-April 2001, she came home from work and found that her husband had removed her gun from the briefcase and left it between the pillows on her bed.  (¶ 190).  Mr. Cao told his wife that he had seen two men in the yard who "looked like Chinese and military trained" and he "thought they were about to assassinate him or were preparing for the assassination."  Mr. Cao suspected that the men might be from the Chinese military and might not agree with Mr. Cao's idea of peaceful unification of China.  (¶ 190).

8.  Reported Sexual Abuse By Mr. Cao of His Stepdaughter

Plaintiff alleges that on or about May 2, 2001, defendant Beth Dawson played a videotape for her third grade class entitled "It's Okay to Tell."  Plaintiff's daughter indicated that her stepfather, Xianqing Cao, had touched her in inappropriate places.  (¶¶ 210-13).  Mrs. Dawson brought the child to the office of Vice Principal Cheryl Carlson.  Carlson reported the incident to the Kalamazoo County Family Independence Agency. (¶¶ 216-17).  Don Smith of Children's Protective Services assigned Heather Hain and Nicole Erickson to the case.  (¶ 218).  Ms. Erickson contacted the Portage Police Department and Detective Michelle Kozminske was dispatched to Amberly Elementary School.  (¶ 235).  Erickson and Hain arrived at the school and interviewed the child with Vice Principal Carlson present inside Ms. Carlson's office.  (¶¶ 225-231).  Ms. Erickson contacted her supervisor, defendant Smith and that Smith instructed Erickson to accompany the police officer to the Cao residence.  (¶¶ 232-33).  Erickson and Hain followed Detective Kozminske to the Cao residence.  (¶ 237).  Erickson and Hain interviewed Mr. Cao's eleven year old stepdaughter just outside the Cao residence.  Detective Kozminske stayed indoors with Mr. Cao.  Based on the

responses provided by the eleven-year old girl, Erickson and Hain determined that removal of the children was appropriate, and they contacted defendant Smith.  (¶ 260).

Erickson contacted the Kalamazoo County Circuit Court and obtained authorization from a family court referee to remove the four children from the Cao residence.  (¶ 284).

9.    Contact with Mr. Cao at his Residence and the Shooting Resulting in his Death

When Detective Kozminske and FIA specialists Erickson and Hain met at the Cao residence at 7192 Bridlewood Circle in Portage, Michigan, they found Xianqing Cao and his eleven-year old stepdaughter at home.  (¶¶ 237-245).  Mr. Cao contacted his wife at work by telephone.  The phone was given to Detective Kozminske and Kozminske asked Mrs. Cao to come home because they wanted to interview her.  Mrs. Cao indicated that she would return home in approximately 20 minutes.  When Mrs. Cao arrived at home Mr. Cao was in the living room with Detective Kozminske.  The eleven year old daughter was in the back yard talking to Erickson and Hain. Detective Kozminske indicated that the women from the FIA would like to speak with her after they had finished speaking to the daughter.  (¶¶ 247-257).

Erickson advised Mrs. Cao that the four children would be removed from the home pursuant to a court order of removal.  Erickson indicated that Mrs. Cao could go to court the next day if the couple wanted the children back. (¶¶ 292-97).  When Mrs. Cao advised Xianqing Cao that the four children were being removed, he responded that it was not acceptable to allow the children to be taken away and believed that if they were taken away, he would never see them again.  (¶ 299). Mr. Cao became increasingly agitated during the process of packing for the removal of the children. Detective Kozminske had advised that he would be arrested if he interfered with the removal.  (¶¶

-14-

307-313).  Ms. Erickson had been holding the Cao's nine-month-old child.  Mr. Cao said "no" to Erickson, ended up with the child, and took the child to the master bedroom upstairs.  (¶¶ 315-17). Erickson joined Detective Kozminske outside the home.  (¶ 318).  Mrs. Cao remained in the master bedroom upstairs attending to "four scared and crying children."  (¶¶ 324, 27).

Xianqing Cao went downstairs.  (¶ 319).  Mrs. Cao claims that when she went downstairs to retrieve a bottle for the baby she heard Xianqing Cao on the telephone state, "They want to kill me because I know too many secrets."  (¶¶ 328-330).  Mrs. Cao returned to the upstairs bedroom.  (¶ 333).

Defendants Jack Bogema and Gregory Burke of the Portage Police Department arrived at the Cao residence at approximately 5:59 p.m. (¶ 334).  Detective Kozminske and Ms. Erickson advised the officers that the Caos had locked them outside the Cao residence.  Detective Kozminske determined that the situation required forceful entry to protect the children.  (¶ 337).  A gun battle erupted as the Officers Bogema and Burke were attempting to gain entry through a rear door to the Cao residence.  Officer Burke received multiple gunshot wounds.  Xianqing Cao was killed.

Plaintiff alleges that the shooting of Xianqing Cao was a "pre-planned plot."  Plaintiff states that she was upstairs at the time of the shooting.  (¶ 347).  She believes that pursuant to a plan Officer Bogema shot Officer Burke in the leg.  Burke then entered the home and shot Xianqing Cao in the navel and leg.  Plaintiff believes that Officer Burke then executed Xianqing Cao by shooting him in the head while he was lying on the kitchen floor.  (¶¶ 350-63).  Mr. Cao's autopsy showed that the cause of death was multiple gunshot wounds.  The medical examiner found no powder on the skin around Xianqing Cao's head wound.  (¶ 367).

10.    Post-Shooting Investigation Conducted by the Kalamazoo County Sheriff's Department

Officers from the Kalamazoo County Sheriff's Department conducted the investigation following the shooting involving Mr. Cao and Officers Bogema and Burke for the City of Portage Police Department. Bogema and Burke were interviewed and statements obtained. (¶¶ 368-77). Other witnesses were questioned. (¶¶ 379, 393). Among other things, the Cao's neighbor Deborah L. Dentler, stated that she observed Mr. Cao shooting at the police officers retreating from the Cao residence. Plaintiff claims that Mrs. Dentler made up the story. (¶ 393).

Defendant Detective Sergeant Marty Johnson of the Kalamazoo County Sheriff's Department arrived at the Cao residence at approximately 9:08 p.m. and coordinated the crime scene investigation. A .22 caliber handgun and .22 caliber brass cartridges were recovered inside the Cao residence. Nine millimeter cartridges were recovered outside the Cao residence. (¶ 384). Plaintiff now contends that Mr. Cao was unarmed and that evidence was moved as part of a cover-up.

11.    Post-Shooting Interview of Mrs. Cao at Portage Police Station

On May 2, 2001, at approximately 8:00 p.m., Sergeant Jako interviewed Mrs. Cao at the Portage Police Department. Plaintiff complains that Sgt. Jako taped the interview "[w]ithout advising [plaintiff] of any right." (¶ 405).[2] Plaintiff stated that when she asked to see her husband

---

[2] Plaintiff attached a copy of the transcript to her response. (docket # 33). Plaintiff related that she had been upstairs with the children and had not witnessed the shooting. (pp. 4, 6, 15). Among other things, plaintiff discussed her husband's psychiatric examination in connection with the criminal charges in Washington, D.C. Plaintiff stated, "But I still don't believe my husband is mentally ill because he behaves normally with me, only that he tells stories like people going to kill him. . . ." (p. 11). Mr. Cao apparently believed that his federal probation officers were out to kill him: "Every time we go there he would say that they will arrest him, they will kill him and he knows too much secret, people would try to reason to kill him." (p.12). Plaintiff stated: "He always feels

-16-

she was advised that he was in surgery and that she couldn't see him.  (¶¶ 406-07, 413).  Plaintiff alleges that during questioning, Jako learned about the .22 caliber handgun she kept in the basement. She further alleges that the interview was interrupted for more than half an hour between 8:30 p.m. and 9:30 p.m.  Plaintiff believes that this "interruption" "gave the opportunity for Jako to inform Jane Cao's gun location and to have Jane Cao's gun retrieved and planted."  (¶¶  390, 408-09). When Sgt. Jako reentered the interview room, plaintiff again inquired about her husband and was advised that he was in surgery and in serious condition.  (¶ 413).  Plaintiff states that the death certificate indicates that Xianqing Cao passed away at 9:42 p.m.  Sgt. Jako advised plaintiff that her house was a crime scene and that she could not stay there that night, but remained free to stay in a hotel.  Plaintiff provided Sergeant Jako with permission to retrieve plaintiff's purse from her residence.  (¶ 414).  According to plaintiff, it was approximately 11:50 p.m. that Sgt. Jako advised plaintiff that Xianqing Cao had died.  (¶ 421).  Plaintiff complains that Jako "ruthlessly denied" her request to see her husband at that time, stating that plaintiff could see her husband's body after the autopsy had been completed.  (¶ 423).  She further faults Sgt. Jako for denying her request not to have an autopsy performed on Xianqing Cao's body.  (¶ 424).

Plaintiff alleges that she was allowed back into her residence on the evening of May 3, 2001.  She discovered that the briefcase was missing from the basement.  The next day she contacted Sgt. Jako he advised her that the briefcase had been removed by the police.  (¶¶ 433, 435).

---

so insecure.  Just yesterday (inaudible) two or three days ago I was at work, he called me, (inaudible) two or three times he said I think I need to see a Doctor, a mental doctor.  He said I'm much too concerned about the China and Taiwan and uh the United States.  Gives me too much stress and I just feel like that I'll be dead . . . ."  (p.12).

12.    <u>Investigation by the Kalamazoo County Prosecutor's Office</u>

On May 14, 2001, James A. Gregart, the Kalamazoo County Prosecuting Attorney wrote a letter to Sheriff Thomas N. Edmunds reflecting the prosecutor's conclusions that the officers' use of deadly force was reasonable, that the officers acted in self-defense, and that Mr. Cao's death was a result of justifiable homicide.

> Please be advised that I have reviewed your Department's investigative reports regarding the May 2, 2001 death of Xianqing Cao occurring at 7192 Bridlewood Street in the City of Portage.

> Based upon the information presented to me, I concur in your analysis that Mr. Cao met his demise as the result of deadly force exercised under circumstances of reasonable and legal self-defense.  Under these circumstances, I find that Mr. Cao's death to be one of Justifiable Homicide.

(¶ 444).  Plaintiff disagrees with the prosecutor's conclusions.  (¶¶ 383, 443-44).

13.    <u>State Court Child Custody Proceedings</u>

On May 3, 2001, following a hearing in the Family Division of the Kalamazoo County Circuit Court the two youngest Cao children were returned to their mother.  (¶ 428).   On July 13, 2001 Judge Colon ordered that the older Cao children be returned to Mrs. Cao.  (¶¶ 477-81). Plaintiff alleges that the children were taken hostage to cover up the murder of Xianqing Cao.

**<u>Plaintiff's Claims</u>**

On the basis of the foregoing facts, alleged in 481 paragraphs, plaintiff sets forth her "claims" in six paragraphs (¶¶ 482-87) as follows:

- a "murder claim" against the Secret Service, the Portage Police Department, and their personnel under 18 U.S.C. § 1117;

- a "conspiracy to murder claim" against the Secret Service, Portage Police Department, Kalamazoo County Family Independence Agency, and their personnel under 18 U.S.C. § 1117;

- a "kidnapping claim" against the Portage Police Department, Kalamazoo County Family Independence Agency,  and their personnel, under 18 U.S.C. § 1201;

- a "conspiracy against rights claim, deprivation of rights under color of law claim, equal rights under the law claim, a rights of person claim, and a guaranteed rights claim" against all defendants under 18 U.S.C. § 241, 18 U.S.C. § 242, 42 U.S.C. § 1981, and the Fifth and Fourteenth Amendments;

- a "search and seizure without due process claim" against the Portage Police Department, Sgt. Jack Bogema, Detective Kozminske, and Officer Burke under the Fourth Amendment;

- a "baring arms claim" against the Secret Service, Portage Police Department, and Kalamazoo County Sheriff's Department under the Second Amendment.

## Discussion

**I.    Claims Belonging to Xianqing Cao or Arising From His Death**

In addition to bringing claims on her own behalf, Mrs. Cao purports to assert claims belonging to her deceased husband, which accrued before his death.  Included within this category of claims are civil rights claims arising from Mr. Cao's interaction with state or federal agents before his death, claims of conspiracy to cause his death, allegations of improper probation supervision, allegations of false accusations against him of child molestation, and any abridgement of his rights in the events leading up to the confrontation with police on the evening of May 2, 2001.  Also

included in this category are claims of Mrs. Cao for conscious pain and suffering, if any, incurred as a result of his injuries. Cases asserting such claims of a deceased person are termed "survival actions," and are predicated upon the decedent's own claim for damages sustained during his lifetime. *See Jones v. Wittenberg Univ.*, 534 F.2d 1203, 1207-08 (6th Cir. 1976).

Distinct from the foregoing claims, which belonged to Mr. Cao, plaintiff asserts her own claims arising from his death. Although her complaint, lengthy as it is, does not clearly delineate the source and nature of those claims, this court is obliged to give the complaint a liberal reading on account of plaintiff's *pro se* status. *Haines v. Kerner*, 404 U.S. 519 (1972). There are two general categories of claims that a person might allege arising from the death of another in these circumstances: a state wrongful death action and a federal civil rights action under 42 U.S.C. § 1983. The court will consider all three claims identified above -- survival action, wrongful death action, and plaintiff's own section 1983 action -- in turn.

A.    Survival Action

As the Supreme Court has made clear, federal law does not cover every issue that may arise in the context of a federal civil rights action. *Moor v. County of Alameda*, 411 U.S. 693, 702 (1973). One specific area not covered by federal law is that related to the survival of civil rights actions upon the death of the plaintiff. *Id.* at 702 n.14. When federal law is silent, 42 U.S.C. § 1988 requires the district court to turn to the common law, as modified by the Constitution and statutes of the forum state, as long as these are not inconsistent with federal law. 42 U.S.C. § 1988. In *Robertson v. Wegmann*, 436 U.S. 584 (1978), the Supreme Court held that section 1988 governs determinations of the applicable survivorship rule to be applied in actions brought under 42 U.S.C.

-20-

§ 1983.  Section 1988 requires resort to state law, unless state law is somehow inconsistent with the federal Constitution or laws.  436 U.S. at 590-93.

        This court must therefore turn to Michigan law in the first instance for guidance on the proper procedures to be followed in the case of Mr. Cao's own survival claims.  Although at common law all personal claims were extinguished by death, Michigan statutory law has changed this result.  Under Michigan law, all actions and claims survive death.  MICH. COMP. LAWS § 600.2921.  Actions on claims for injuries resulting in death, however, "shall not be prosecuted after death of the injured person except pursuant to the next section."  *Id.*  The "next section" is the Michigan Wrongful Death Act, MICH. COMP. LAWS § 600.2922.  The Wrongful Death Act provides a comprehensive and exclusive remedy arising from the death of a person caused by the wrongful act, neglect, or fault of another.  The Wrongful Death Act provides that "every action" must be brought by and in the name of the personal representative of the estate of the deceased person.  MICH. COMP. LAWS § 600.2922(2).  The beneficiaries of a wrongful death action are not the decedent's heirs at law; rather the persons who may be entitled to damages are limited to those identified in the statute, including the deceased spouse, children, descendants, parents, grandparents, and brothers and sisters.  *Id.* at 600.2922(3).  The Michigan courts have repeatedly held that only the personal representative of the deceased can bring a wrongful death action.  *See Maiuri v. Sinacola Const. Co.*, 170 N.W.2d 27, 28 (Mich. 1969) ("The language of the statute is mandatory."); *Smith v. Henry Ford Hosp.*, 557 N.W.2d 154, 156 (Mich. Ct. App. 1996); *Warren v. Howlett*, 383 N.W.2d 636, 638 (Mich. Ct. App. 1986); *Fisher v. Volkswagenwerk Aktiengesellschaft*, 321 N.W.2d 814 (Mich. Ct. App. 1982).  This provision has been held to bar a widow from suing in her own right,

-21-

as the action must be brought by the personal representative of the deceased.  *See Herbert v. Cole*, 321 N.W.2d 388, 390 (Mich. Ct. App. 1982).

> In the case of death rather than injury, the Wrongful Death Act was held to encompass the damages a wife might recover.  She does not have a separate cause of action against a tortfeasor who kills her husband as she does against the one who injured him.

*Cole*, 321 N.W.2d at 390.  As the Michigan survival statute provides that all actions and claims survive death, without substantive limitation on the right to recovery, the court discerns no inconsistency with the federal policy underlying section 1983 actions.

The analysis for claims against federal officers brought pursuant to *Bivens* is somewhat different, but the result is the same.  In *Carlson v. Green*, 446 U.S. 14 (1980), the Supreme Court held that *Bivens* actions arising from an allegedly unconstitutional death are not directly controlled by state survival statutes.  Rather, as a creature of the federal common law, survival of *Bivens* actions must be likewise governed by federal common law.  446 U.S. at 23.  The *Carlson* Court stated that this result was especially important where state law would otherwise require abatement of the *Bivens* claim.  *Id.* at 24.  After *Carlson*, however, the lower federal courts continue to "borrow" state survival and wrongful death statutes, via section 1988, to fill gaps left by *Bivens. See, e.g., Grandbouche v. Clancy*, 825 F.2d 1463, 1465 (10th Cir. 1987).  Such borrowing from state law obviates the need to fashion an independent common law rule from whole cloth.  *See Green v. Carlson*, 581 F.2d 669, 674 (7th Cir. 1978), *aff'd*, 446 U.S. 14 (1980).  One of the procedural features of state law followed by analogy in such cases is the requirement that survival actions be brought by the personal representative or other designated fiduciary identified by state statute.  *See, e.g., Hill v. Martinez*, 87 F. Supp. 2d 1115, 1121 (D. Colo. 2000).  In the absence of

such procedural guidance, the courts could be faced with chaos, as relatives, personal representatives, spouses, and perhaps others might all seek to bring their own duplicative and perhaps conflicting *Bivens* actions arising from a death.  Therefore, if called upon to fashion a common-law rule of procedure to govern *Bivens* survival actions, this court would adopt the nearly universal requirement in this country that such actions be brought by the personal representative on behalf of the decedent's estate.

In summary, civil rights claims against state actors (arising under 42 U.S.C. § 1983) and against federal agents (arising under *Bivens*) which Mr. Cao had at the time of his death survive unabated.  Such claims, however, must be brought pursuant to the procedures set forth in the Wrongful Death Act, MICH. COMP. LAWS § 600.2922, by the personal representative.  Plaintiff alleges that she is the personal representative of Xianqing Cao, and the court can take judicial notice of the pendency of a probate estate in the Kalamazoo County Circuit Court, in which plaintiff has been named personal representative.  *In the matter of Xianqing Cao, Deceased*, case no. 2001-0632 DE.

This finding does not end the court's analysis, however.  Mrs. Cao is not a licensed attorney.  Federal law specifies that cases in the courts of the United States may be conducted only by the parties personally or through counsel.  28 U.S.C. § 1654.  That statute provides that, "in all courts of the United States, the parties may plead and conduct *their own cases* personally or by counsel, as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."  28 U.S.C. § 1654 (emphasis added).  The statute clearly makes no provision for a *pro se* party to represent others.  The federal courts have long held that section 1654 preserves a party's right to proceed *pro se*, but only with respect to her own claims.  Only a licensed attorney may

-23-

represent other persons.  *See Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201-03 (1993); *United States v. 9.19 Acres of Land*, 416 F.2d 1244, 1245 (6th Cir. 1969).  Relying on this statute, the Sixth Circuit has squarely held that a *pro se* party may not prosecute a representative wrongful death action brought under section 1983, where the beneficiaries thereof included persons other than himself.  *Shepherd v. Wellman*, 313 F.3d 963, 970 (6th Cir. 2003).  The court relied on an earlier Second Circuit case, which had held that an administratrix or executrix of an estate may not proceed in a wrongful death action *pro se* when the estate has beneficiaries and creditors other than the litigant.  *Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997).

In the present case, there are clearly statutory beneficiaries under the Wrongful Death Act other than plaintiff herself, in that she alleges that Mr. Cao died leaving children.  *See* MICH. COMP. LAWS § 600.2922(3)(a).  Under the Wrongful Death Act, all persons designated in subsection (3) who "suffered damages" are entitled to a share of the proceeds of a wrongful death action.  *Id.* at § 600.2922(6)(d).  The estate itself (which includes creditors) is entitled to any award for conscious pain and suffering.  *Id.*  Under the clear holding of *Shepherd*, plaintiff is not entitled to represent either the beneficiaries under the Wrongful Death Act or the estate of her deceased husband in a *pro se* action, nor can she appear *pro se* on behalf of her minor children.  *Shepherd*, 313 F.2d at 970.  All survival claims of Mr. Cao must therefore be dismissed without prejudice.

B.    Wrongful Death Action

As the Sixth Circuit has noted, a separate and distinct cause of action, termed a wrongful death action, may arise upon a person's death.  Unlike a survival action, which asserts the

-24-

claims of the deceased person himself, a wrongful death action is designed to compensate a decedent's beneficiaries for any injury they may have suffered by virtue of his untimely death. *Jones*, 534 F.2d at 1207.  When a federal civil rights action is brought arising from a person's death, a wrongful death action must be treated as a state claim falling within the court's pendent jurisdiction.  *See Jako v. Bloechle*, 739 F.2d 239, 243 n.5 (6th Cir. 1984).  In the present case, as noted above, Michigan law creates a wrongful death action in favor of the surviving spouse, children, and certain other identified beneficiaries arising from a death "caused by wrongful act, neglect, or fault of another.  MICH. COMP. LAWS § 600.2922.  The claim, however, cannot be prosecuted by the individual beneficiaries, but must be brought by and in the name of the personal representative of the estate of the deceased person.  *Id.* at § 600.2922(2).  Consequently, the same prohibition discussed above in connection with Mr. Cao's survival action applies to any pendent state wrongful death claim:  such claims may only be brought by a licensed attorney, and not by a *pro se* party, even when that party is one of the beneficiaries.  *Shepherd*, 313 F.2d at 970.  The pendent wrongful death claim (although unpleaded) must therefore be dismissed on this ground.[3]

C.    Plaintiff's Own Section 1983 Claim Arising from the Death of Xianqing Cao

The other possible claim arising from the death of Xianqing Cao is a section 1983 action by plaintiff against the state officers responsible for his death, asserting claims in plaintiff's own right.  It is clear in the Sixth Circuit that a family member does not have an individual section 1983 claim for the wrongful death of another.  The landmark case is *Jako v. Bloechle*, 739 F.2d 239

---

[3] If, during the pendency of this matter, plaintiff procures the services of licensed counsel, the court will reinstate Mr. Cao's survival claims and the personal representative's wrongful death action, providing that counsel can state a valid claim supporting such actions.

(6th Cir. 1984), a section 1983 action brought by a mother, as personal representative of her deceased son, arising from a shooting by police officers.  The *Jako* case is instructive because it analyzes each of the three kinds of claims that can arise in such circumstances.  First, the court drew the clear distinction between survival actions, which assert claims belonging to the deceased, and wrongful death claims.  With regard to the decedent's own section 1983 claim, the Sixth Circuit found that the claim survived under *Robertson v. Wegmann*.  The court concluded that the "decedent's civil rights claim, a personal cause of action, may be pursued in the name of the decedent's personal representative," as defined by Ohio law.  739 F.2d at 244.  The court further noted that the distinct claim of the decedent's heirs under the wrongful death statute is a state claim, subject to the trial court's pendent jurisdiction.  *Id.* at 243 n.5.  Finally, addressing the mother's own section 1983 claim, the court noted that the statute, by its own terms, grants a cause of action "to the party injured."  *Id.* at 239.  The section 1983 cause of action, "by virtue of the explicit language of the section itself, is a personal action cognizable only by the party whose civil rights had been violated." *Id.* at 242.  On this basis, the *Jako* court held that the plaintiff lacked standing to commence her own action under section 1983, as opposed to her deceased son's section 1983 survival action.  *Id.*

The Court of Appeals again had occasion to review this issue in *May v. County of Trumbull, Ohio*, No. 96-3676, 1997 WL 651662 (6th Cir. Oct. 20, 1997), a suit by parents arising from the jail suicide of their son.  As the parents were the administrators of their son's estate, the court reviewed on the merits the son's section 1983 claim brought as a survival action by the plaintiff/administrators.  With regard to the parents' own section 1983 claim, however, the court relied upon *Jako*, holding that the parents lacked standing:

Under *Jako v. Bloechle*, 739 F.2d 239 (6th Cir. 1984), the Mays do not have standing to bring a wrongful death action under § 1983, based on the premise that a § 1983 claim is personal to the injured party.  However, the plaintiffs argue that since *Jako* was decided, other circuits have come to a different conclusion and have undermined the reasoning of *Jako*.  Nevertheless, that is the law of this circuit.  We reaffirm the district court's ruling that the Mays lacked standing to bring an action for wrongful death.

1997 WL 651662 at * 3.

In *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000), the Sixth Circuit succinctly

summarized the well-established law in this area as follows:

In the Sixth Circuit a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort.  Accordingly, only the purported victim, or his estate's representative(s) may prosecute a section 1983 claim; conversely, no cause of action may lie under a section1983 claim for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members.

*Id.* at 357 (citations omitted); *see also Moreno v. Metropolitan Gen. Hosp.*, No. 99-5205, 2000 WL

353537, at * 3 (6th Cir. Mar. 28, 2000) (quoting *Claybrook* at length and holding that the decedent's

parents did not have standing to bring a claim under section 1983).

Since *Jako* was decided, numerous courts in the Sixth Circuit have declined to allow

section 1983 actions by family members arising from an allegedly wrongful death, holding that the

only 1983 claim is that of the decedent himself.  *See, e.g., Wingrove v. Forshey*, 230 F. Supp. 2d 808,

824-25 (S.D. Ohio 2002); *Alexander v. Beale Street Blues Co.*, 108 F. Supp. 2d 934, 953 n.16 (W.D.

Tenn. 1999) (holding that *Jako* continues to be the law of the Sixth Circuit and that decedents'

survivors may not recover for their own damages under section 1983); *Kelly v. Wehrum*, 956 F.

Supp. 1369, 1373 (S.D. Ohio 1997) (mother of decedent lacks standing to bring a section 1983 claim

for the loss of companionship of her son arising from wrongful death); *Gravely v. Madden*, 964 F.

-27-

Supp. 260, 264 (S.D. Ohio 1995) (loss of companionship claim by parent for death of child not cognizable under section 1983); *see also Broadnax v. Webb*, 892 F. Supp. 188, 190 (E.D. Mich. 1995) (constitutional violation directed against person does not confer standing on person's family members).

Under the clear holding of *Jako* and its progeny, the only cognizable claims in the present circumstances are Mr. Cao's own section 1983 claim, which survives his death but must be brought by his personal representative through counsel, and a pendent state wrongful death action, which also must be brought by counsel.  Because plaintiff is proceeding *pro se*, those claims must be dismissed without prejudice.  Plaintiff lacks standing to assert her own section 1983 claim arising from the death of her husband, as that claim is personal to the injured party.  *See Jako*, 739 F.2d at 242.  Under the foregoing authorities, this court is constrained to dismiss all survival claims belonging to Mr. Cao and all claims of Mrs. Cao arising from her husband's death.  Mrs. Cao is entitled to proceed *pro se* only with regard to the acts and omissions of defendants that abridged her personal rights, not those of her husband.

## II.    Motion to Dismiss by Federal Defendants

Plaintiff has named the United States Secret Service and John Does 1 and 2, sued in their official and individual capacities, as defendants.  The United States has moved to dismiss all claims against these defendants either for lack of subject-matter jurisdiction or for failure to state a claim upon which relief can be granted.  Although the complaint alleges numerous contacts between federal officers and Mr. Cao in connection with his arrest and conviction in Washington, D.C., plaintiff's claims against the federal defendants appear to involve the events leading up to the fatal

confrontation on May 2, 2001.  Plaintiff alleges that on March 25, 2001, two Secret Service agents visited the Cao's home, because President Bush was scheduled to appear in Kalamazoo in the near future.  One of the officers allegedly asked Mrs. Cao to leave her pistol with the Portage Police Department, but she refused, although she did show the agents the gun.  (Complaint, ¶¶ 164-68). Plaintiff asserts that she left the gun case unlocked, because of distractions created by one of the officers.  (*Id.*, ¶ 169).  In mid-April 2001, she found that her husband had removed the gun from the briefcase and had put it between the pillows on her bed.  (*Id.*, ¶ 190).  Apparently, Mr. Cao was concerned about people who he thought were Chinese military officers who were preparing to assassinate him.  (*Id.*).  Mrs. Cao instructed her husband not to use the gun unless someone were trying to break into their house.  (*Id.*, ¶ 191).  On the basis of these allegations, plaintiff charges the Secret Service and its two unnamed officers with violating her rights and with complicity in her husband's death.  As noted above, a *pro se* plaintiff may only assert her own rights in the present action.

### A.    Motion to Dismiss For Lack of Jurisdiction

Plaintiff has sued the United States Secret Service, an agency of the federal government.  She has also sued two "John Doe" officers of the Secret Service, in their official capacities.  Lawsuits directed at federal agencies or against federal officers or employees in their official capacities are lawsuits against the United States.  *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Alkire v. Irving*, 330 F.2d 802, 810 (6th Cir. 2003).  The United States government and its agencies are immune from suit unless the immunity has been expressly waived.  *See Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999).  The United States, as a sovereign, cannot be sued

without its prior consent.  *See Montez v. United States*, 359 F.3d 392 (6th Cir. 2004); *McGinness v. United States*, 90 F.3d 143, 145 (6th Cir. 1996).  "Sovereign immunity is jurisdictional in nature." *Gao v. Jenifer*, 185 F.3d 548, 554 (6th Cir. 1999).  "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).

A plaintiff suing the federal government has the burden of pleading that the government has waived sovereign immunity and of identifying the specific statutory provision containing the waiver.  *See Lundeen v. Mineta*, 291 F.3d 300, 304 (5th Cir. 2002); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *Baker v. United States*, 817 F.2d 560, 562 (9th Cir. 1987).  The waiver must be express, *see Lane v. Pena*, 518 U.S. 187, 192 (1996), and the scope of any waiver is to be strictly construed in favor of the sovereign.  *Blue Fox*, 525 U.S. at 261.  Plaintiff has not identified any waiver of sovereign immunity that would allow her to bring suit against the United States.  In fact, it is clear that the United States has not waived its sovereign immunity for claims seeking damages based upon alleged violations of the Constitution committed by federal officers, agents, or employees.  *See FDIC v. Meyer*, 510 U.S. 471, 484-86 (1994).  Plaintiff's claim against the Secret Service, and against the unnamed officers acting in their official capacities, must therefore be dismissed for lack of subject-matter jurisdiction.

Read with the required indulgence, plaintiff's complaint may be seen as attempting to allege a claim under the Federal Tort Claims Act (FTCA).  The FTCA is a limited waiver of sovereign immunity for tort actions arising under state law, brought against the United States for the negligent acts of its employees.  *See* 28 U.S.C. § 2674.  A plaintiff seeking to proceed under the

FTCA, however, must strictly abide by the restrictions placed by Congress on its waiver of sovereign immunity.  *See FDIC v. Meyer*, 510 U.S. at 476.

        One statutory condition to the maintenance of an FTCA action is that a plaintiff must first present an administrative claim to the appropriate agency.  28 U.S.C. § 2675(a).  Such claims must be presented in writing to the agency within two years after the claim accrues, or else be barred. 28 U.S.C. § 2401(b).  The requirement of a timely administrative claim is jurisdictional.  *See Blakely v. United States*, 276 F.3d 853, 865 (6th Cir. 2002); *Joelson v. United States*, 86 F.3d 1413, 1422 (6th Cir. 1996).  In the present case, plaintiff does not allege that she filed an administrative claim with the Secret Service, and the time to do so has now expired.  This court therefore lacks jurisdiction over any FTCA claim.

        B.      <u>Federal Defendants' Motion to Dismiss For Failure to State a Claim</u>

        The only other federal claim arising from the facts alleged in the complaint would be a *Bivens* action against the individual Secret Service agents for violation of plaintiff's constitutional rights.  Although plaintiff has not invoked *Bivens*, the court will examine her pleading to discern whether she has stated a *Bivens* claim against either individual defendant.[4]  In support of her claim against the federal agents, plaintiff principally invokes federal criminal statutes, such as 18 U.S..C. §§ 241, 242, 1111, 1117, and 1201.  Plaintiff charges the defendants with murder, conspiracy to commit murder, kidnapping, and other federal crimes.  Plaintiff lacks standing to initiate criminal charges against any defendant.  *See Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973).  Moreover, criminal statutes do not create private rights of action unless Congress expressly so provides.  *Cok*

       [4] As the United States has pointed out, neither defendant has been properly served.

*v. Constantino*, 876 F.2d 1, 2 (1st Cir. 1989).  Consequently, it is well settled that section 241 and other criminal statutes cannot provide a private cause of action.  *See, e.g., Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994); *Newcomb v. Ingle*, 827 F.2d 675, 677 n.1 (10th Cir. 1987); *Deubert v. Gulf Federal Sav. Bank*, 820 F.2d 754, 760 (5th Cir. 1987).  Plaintiff's invocation of these criminal statutes cannot state a cognizable civil claim.

The only factual allegations that could possibly give rise to a *Bivens* claim for violation of plaintiff's own rights are those involving the visit of the two federal officers to plaintiff's home on March 25, 2001.  Accepting these allegations of fact as true, the court discerns no possible abridgement of plaintiff's federally guaranteed rights.  Plaintiff invokes her Second Amendment right to bear arms.  It is well settled that the Second Amendment does not create an individual right to bear arms.  *See Olympic Arms v. Buckles*, 301 F.3d 384, 388-89 (6th Cir. 2002).  The Second Amendment guarantees a collective, rather than an individual right.  *See United States v. Napier*, 233 F.3d 394, 402-03 (6th Cir. 2000).  There is no express constitutional right of an individual to possess a firearm.  *United States v. Bournes*, 339 F.3d 396, 397 (6th Cir. 2003), *cert. denied*, 124 S. Ct. 1041 (2004).  Plaintiff's Second Amendment claim therefore fails on legal grounds.  Furthermore, even assuming some Second Amendment right of an individual to bear arms, the facts alleged against the Secret Service agents, accepted as true, fail to show any abridgement of that right.  The officers merely inquired concerning Mr. Cao, and asked plaintiff to surrender her firearm to the Portage Police Department.  When plaintiff refused, that was the end of the matter.  Consequently, plaintiff has failed to state any cognizable *Bivens* action against the individual Secret Service officers.  The action against the officers will be dismissed for failure to state a claim upon which relief can be granted.

**III.     Motion to Dismiss by the Portage Defendants**

Plaintiff has attempted to allege claims against the Portage, Michigan, Police Department and several municipal employees: Detective Michelle Kozminske, Sgt. Jack Bogema, Police Officer Gregory Burke, and Police Officer Matthew Scott Barkley. Plaintiff's claims against the Portage defendants arise from the confrontation at plaintiff's home on May 2, 2001, which ultimately resulted in the death of plaintiff's husband. Plaintiff asserts claims belonging to Mr. Cao (for example, that officers violated his right to equal protection by failing to provide him with a translator and that the police "murdered" Mr. Cao), which are not properly before the court, for the reasons set forth in section I above. Furthermore, any claims of Mr. Cao's estate or of Mrs. Cao personally, arising from Mr. Cao's death, had previously been dismissed. The court will therefore only review plaintiff's own claims under section 1983 against the municipality and its employees arising from the events of May 2, 2001.

**A.     Claims Against Individual Officers**

Plaintiff asserts that the individual officers of the Portage Police Department violated her constitutional rights in connection with the events of May 2, 2001. Although plaintiff does not expressly invoke 42 U.S.C. § 1983, a liberal reading of her complaint leads to the conclusion that she is attempting to assert a claim against these municipal officers, who act under color of state law, for violation of her federally guaranteed rights. The facts alleged in the complaint might give rise to two constitutional claims against the municipal officers: a Fourth Amendment claim arising from the warrantless entry into plaintiff's home and a claim for interference with her constitutionally protected parental rights (which plaintiff denominates as a "kidnapping" claim) arising from the

-33-

removal of plaintiff's children from the house.  Defendants have asserted the defense of qualified immunity as to all claims against them.

In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818.  The standard to be applied in deciding a claim of qualified immunity is one of objective reasonableness. *Id.*  The question whether qualified immunity attaches to an official's actions is a purely legal issue for the trial court.  *See Summar v. Bennett*, 157 F.3d 1054, 1057 (6th Cir. 1998); *Dominque v. Telb*, 831 F.2d 673, 677 (6th Cir. 1987).

The Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194 (2001), emphasized that the defense of qualified immunity must be addressed in proper sequence.

> In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.  Qualified immunity is an entitlement not to stand trial or face other burdens of litigation.  The privilege is *an immunity from suit* rather than a mere defense to liability; and like an absolute liability, it is effectively lost if a case is erroneously permitted to go to trial.  As a result, we  repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.

533 U.S. at 200-01 (citations omitted).  The initial inquiry must be whether the plaintiff has alleged and supported with evidence facts showing that the officers' conduct violated a constitutional right.  533 U.S. at 201; *Akers v. McGinnis*, 352 F.3d 1030, 1042 (6th Cir. 2004).  If the first question is answered in the affirmative, the court must then determine whether that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right.  533 U.S. at 201.  "A constitutional right must be clearly established in

-34-

a particularized sense.  'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Rippy v. Hattaway*, 270 F.3d 416, 424 (6th Cir. 2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"It is crucial, the Supreme Court has noted, that the second inquiry 'be undertaken in light of the specific context of the case, not as a broad general proposition.'  Thus, '[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quoting *Saucier*, 533 U.S. at 201); *see Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003); *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002).  The court, of course, need not find a case in which the very action in question has previously been held unlawful, but in light of pre-existing law, the unlawfulness must be apparent.  *See Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003); *Risbridger v. Connelly*, 273 F.3d at 569; *Comstock*, 273 F.3d at 702.  However, "'qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.'"  *Rippy v. Hattaway*, 270 F.3d at 424 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "Thus, officials are 'entitled to qualified immunity [when] their decision was reasonable, even if mistaken.'"  *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).  The court must focus on whether, at the time defendant acted, the right asserted was "clearly established" by the decisions of the Supreme Court or the Sixth Circuit.  *See Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002); *Comstock v. McCrary*, 273 F.3d at 702; *Walton v. City of Southfield*, 995 F.2d 1331, 1335-36 (6th Cir. 1993); *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir. 1988).  "If reasonable officials could disagree on the issue, immunity should be recognized."  *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999); *see Virgili v. Gilbert*, 272 F.3d

391, 393 (6th Cir. 2001); *see Akers*, 352 F.3d at 1042.  "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow to raise a question about), the conclusion for every-like situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Saylor v. Board of Educ.*, 118 F.3d 507, 514 (6th Cir. 1997); *see Gragg*, 289 F.3d at 964.  "The burden of convincing a court that the law was clearly established 'rests squarely with the plaintiff.'" *Key* 179 F.3d at 1000 (quoting *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997)).

### 1.    Fourth Amendment Claim

The Fourth Amendment to the Constitution, applicable to the states as well as the federal government, requires that every search or seizure by a government agent must be reasonable. The Supreme Court has generally interpreted this requirement to mean that an arrest or search must be based on probable cause and executed pursuant to a warrant.  *See Katz v. United States*, 389 U.S. 347, 357 (1967).  Police officers' entry into a home without a warrant is presumptively unconstitutional.  *See O'Brien v. City of Grand Rapids*, 23 F.3d 990, 996 (6th Cir. 1994).  It is undisputed that on May 2, 2001, officers of the Portage Police Department did enter the Cao home without a warrant. Warrantless entries are permitted in some circumstances, however, including where "exigent circumstances" exist.  Warrantless entry into a home has been upheld under the exigent circumstances doctrine in a number of circumstances, including where the delay involved in procuring a warrant would endanger the lives of officers or citizens.  *See, e.g., Warden v. Hayden*, 387 U.S. 294, 298-99 (1967); *see Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984) (exigent circumstances exist where

there are real, immediate, and serious consequences that would certainly occur were a police officer to postpone action to get a warrant).

In the present case, defendants have raised the defense of qualified immunity to shield them from liability for the warrantless entry into plaintiff's home.  The relevant inquiry, therefore, is not whether exigent circumstances truly existed, but whether "the facts are such that an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed." *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996).  In support of their claim of qualified immunity, defendants have presented affidavits and other evidence outside the four corners of the complaint, and have asked in the alternative for dismissal of the complaint or for summary judgment.  The court finds that recourse to the affidavits and other evidentiary material, however, is unnecessary, as the allegations in plaintiff's complaint themselves establish the existence of circumstances which, when viewed by an objectively reasonable officer, justify a warrantless entry for exigent circumstances.[5]

Plaintiff's own complaint pleads the following facts, relevant to the events leading up to the warrantless entry of her home:

•    On May 2, 2001, in connection with a school program, plaintiff's daughter told teachers that her stepfather, Xianqing Cao, had touched her in inappropriate places.  (Complaint, ¶¶ 210-13).

---

[5] In response to defendants' motion, plaintiff submitted to the court a number of police reports and other official documents surrounding the incident.  If the court were to take these materials (docket # 53) into account, exigent circumstances would be established beyond any reasonable doubt.  The court is, however, limiting its review to the complaint.

- School officials contacted the Portage Police Department, who dispatched defendant Michelle Kozminske, a detective, to the Amberly Elementary School.  (¶ 235).

- At the same time, employees of the Children's Protective Services were dispatched to the school.  Ultimately, these child protection workers and Detective Kozminske went to the Cao residence.  (¶¶ 225-237).

- While the child protection workers interviewed the girl at the residence, Detective Kozminske stayed indoors with Mr. Cao.  (¶ 251).

- The child protection workers ultimately determinated that all children should be removed from the home.  (¶ 260).  They contacted the Kalamazoo County Circuit Court and obtained authorization from a family court referee to remove the children.  (¶ 284).

- Mrs. Cao, who had been summoned home from work, told her husband that the children would be removed from the home.  (¶ 298).  Mr. Cao told her that "it was not acceptable to allow these strangers to take away the children especially the two babies; the couple would never see the children again if they were taken away."  (¶ 299).

- As the detective and the child protection workers started to remove the children, Mr. Cao said "they could not allow these strangers to take away their babies."  (¶ 309).  He also said he would "fight not to let them take away the children."  (¶ 321).  The Caos locked the doors and drew the shades.

- Apparently because of the resistance, the child protection workers left the house (¶ 318) and Mrs. Cao went upstairs with her four children.  (¶ 324).

- Defendants Bogema and Burke of the Portage Police Department arrived at the residence at approximately 6:00 p.m. (¶ 334).  Detective Kozminske advised the officers that the Caos

had locked them outside the residence.  Detective Kozminske determined that the situation required forceful entry to protect the children.  (¶¶ 334, 337).

The Sixth Circuit Court of Appeals has repeatedly held that exigent circumstances exist where, as here, an apparently deranged person engages in a standoff with police, creating a danger to innocent persons inside the house.  For example, in *Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002), the Court of Appeals granted qualified immunity to officers, when the facts showed that at the time of entry into the home the officers had credible evidence that the person inside the home was mentally disturbed and volatile, that he had been brandishing a shotgun in a threatening manner, and that he had inexplicably kept his son home from school that day.  287 F.3d at 502.  Similarly, in *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992), the court found that exigent circumstances existed as a matter of law where the police received a call concerning a suicidal and possibly homicidal gunman, shots had been reported fired, and at least one radio communication indicated that the gunman had threatened to kill any police officers who had arrived. 958 F.2d at 1375.  In *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996), the court concluded that summary judgment based upon exigent circumstances was appropriate where the police made an unannounced forcible entry while responding to a call that a drunken man was screaming and had fired shots in his house.  101 F.3d at 1160.  Although it was later determined that the suspect was alone in his house and was screaming into a telephone, the court determined that it was reasonable for police officers to believe that someone else was in the house and was in immediate peril of bodily harm in the circumstances.  *Id.*  The law of the other circuits is consistent with Sixth Circuit precedent.  *See, e.g., Tierney v. Davidson*, 133 F.3d 189, 197 (2d Cir. 1998) (entry into home valid when officers responded to a domestic violence call, found a broken window upon arrival, and feared

someone inside was injured); *United States v. Cunningham*, 133 F.3d 1070, 1072 (8th Cir. 1998) (entry valid because police responded to 911 call and found woman held against her will in apartment).

In the present case, the Portage police officers were on the scene because of a request for help from child protection workers, who had procured court authorization to remove four children from the Cao home. The basis for the judicial authorization was the alleged sexual abuse by Mr. Cao of one of the children. When Detective Kozminske and the child protection workers attempted to execute the court order peacefully, they were forcefully resisted by Mr. Cao and his wife, forcing the officers to leave the home. It was only then that Officers Burke and Bogema arrived. Any reasonable officer in that situation would have entertained serious fears for the welfare of the children locked in the house with an obviously deranged man.

As the Court of Appeals has remarked, the Fourth Amendment does not require police to stand idly by while observing others in grave danger. *Ewolski*, 287 F.3d at 503. Officers responding to the scene are entitled to rely upon reports from others in determining the existence of a threat creating exigent circumstances for a warrantless entry. *Id.* Had the officers not entered the home, their inaction might have had even more serious consequences. The court therefore finds that plaintiff's own allegation of facts establishes circumstances which, if viewed by an objectively reasonable officer, created exigent circumstances.

Furthermore, even if an issue of fact were to exist as to whether a reasonable officer would have perceived an immediate threat to the children trapped in the home with Mr. Cao, summary judgment would still be appropriate on the basis of the "clearly established" prong of the qualified immunity test. As the *Ewolski* court noted, no decision of the Supreme Court or the Sixth

Circuit has held that conduct similar to that found in the present case constituted a Fourth Amendment violation. 287 F.3d at 505 (affirming a grant of qualified immunity to officers making a warrantless entry because of tangible concerns for the safety of the suspect's family).

For the foregoing reasons, the court finds that the allegations of the complaint, accepted as true, fail to overcome the qualified immunity defense asserted by the officers of the Portage Police Department, in that plaintiff's own allegations establish the existence of exigent circumstances.

### 2.    Interference With Parental Rights

The federal Constitution protects fundamental family relationships and prohibits unwarranted or arbitrary state interference. *See Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987). Plaintiff's claim of "kidnapping," read with the required liberality, appears to be an attempt to assert interference with her constitutional rights in this regard, arising from defendants' removal of her four children from the home. According to the allegations of plaintiff's complaint, the removal was done pursuant to the direction of the state family court, and there were extensive family court proceedings thereafter. (*See* Complaint, ¶¶ 428, 477-81).

By plaintiff's own admission, the Portage Police Department officers removed the children from her home pursuant to a direction of the state court to do so. Defendants have asserted the defense of immunity, which this court finds meritorious. When an officer acts pursuant to a facially valid judicial order or warrant, the officer is entitled to absolute immunity. *See Baker v. McCollan*, 443 U.S. 137 (1979); *Bush v. Rauch*, 38 F.3d 842, 847-48 (6th Cir. 1994). It is well settled that law enforcement personnel, acting in furtherance of their official duties in relying on a facially valid court order, are entitled to absolute quasi-judicial immunity from suit in a section 1983

action. *Rowland v. Phillips*, 19 F.3d 552, 556 (11th Cir. 1994).  Detective Kozminske and the other officers of the Portage Police Department were not exercising their own judgment in removing the children from the home.  Rather, they were acting pursuant to the direction of the state family court. They are therefore entitled to absolute, quasi-judicial immunity from damage suit.  *See Coverdell v. Dep't of Soc. & Health Servs.*, 834 F.2d 758 (9th Cir. 1987) (child protective services worker entitled to absolute immunity for obtaining and executing *ex parte* order directing that child be placed into temporary state custody); *see also Smith v. City of Bad Axe*, No. 94-1783, 1996 WL 23219, at * 1 (6th Cir. Jan. 22, 1996) (citing *Coverdell* with favor and holding that a social worker and police officer assisting in removal of Smith from her home and returning her to a nursing home against her will pursuant to a court order were entitled to immunity)..

        In summary, the court concludes that plaintiff has failed to state a claim upon which relief can be granted against any of the individual members of the Portage Police Department sued in this action, as the allegations of plaintiff's complaint demonstrate that the officers are entitled to qualified immunity on her Fourth Amendment claims and quasi-judicial immunity on her "kidnapping" claims.

        B.    Portage Police Department

        Plaintiff has named the Portage Police Department as a defendant.  A police department is not a legal entity under Michigan law and lacks the capacity to sue or be sued.  *See Haverstick Ent., Inc. v. Financial Fed. Credit, Inc.*, 32 F.3d 989, 992 n.1 (6th Cir. 1994); *Mooney v. City of Holland*, 490 F. Supp. 188, 190 (W.D. Mich. 1980).  Suits against police departments are deemed to be brought against the municipality itself.  *Haverstick*, 32 F.3d at 992 n.1.  The court will therefore construe plaintiff's complaint as being brought against the City of Portage itself.

-42-

The Supreme Court has held that a municipality is a "person" for purposes of section 1983 and that municipalities may not be held liable on a *respondeat superior* theory. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Liability may only be found against a municipality when its employees have acted pursuant to an official policy or custom. *Id.* at 694-95; *see Graham v. County of Washtenaw*, 358 F.3d 377 (6th Cir. 2004).  Plaintiff has not alleged that the actions of police officers were done pursuant to an unconstitutional policy or custom, nor do her responsive briefs address the issue.  Her complaint fails to state a claim under *Monell* for municipal liability against the City of Portage.

### III.    Motion of Kalamazoo County Defendants

Plaintiff has named as defendants the following officers of Kalamazoo County: James Gregart (Kalamazoo County Prosecuting Attorney); Carrie Klein (Assistant Prosecuting Attorney); Sgt. Marty Johnson and Deputy Ken Jako, both of the Kalamazoo County Sheriff's Department.  Additionally, plaintiff has named the county sheriff's department itself.  Plaintiff's claims against these defendants arise from the investigation of the events surrounding the death of plaintiff's husband.  Plaintiff charges these defendants with fabrication of evidence, dereliction of duty, and conspiracy to cover up the true cause of her husband's death.  In addition, she charges defendant Jako of violating her *Miranda* rights by failing to give her the proper warnings before taking her recorded statement.

### A.    Prosecutor and Assistant Prosecutor

Plaintiff contends that Prosecuting Attorney Gregart should have waited longer, until all tests had been returned, before concluding that the death of her husband was a justifiable

homicide.  She also asserts that Gregart and Assistant Prosecutor Klein were negligent in their analysis of the case and in their decision not to prosecute those responsible for her husband's death. The prosecutor and assistant prosecutor have asserted the defense of prosecutorial immunity, which this court finds to be meritorious.  Under this doctrine, prosecutors are immune from damage suits for their decisions to initiate or not initiate criminal prosecutions.  *See Imbler v. Pachtman*, 427 U.S. 409 (1976); *Blakely v. United States*, 276 F.3d 853, 871 (6th Cir. 2002).  The decision to prosecute or not prosecute, even if malicious, enjoys absolute immunity under this doctrine.  *See Byrnes v. Reed*, 500 U.S. 478, 492-93 (1991).  All of the alleged wrongdoing asserted against these two defendants fall squarely within the ambit of the doctrine of prosecutorial immunity.

### B.    Sheriff's Deputies

Plaintiff asserts claims of wrongdoing against the investigators in the Sheriff's Department.  For example, she asserts that Sgt. Marty Johnson failed to investigate the death properly, failed to obtain telephone records of an eye witness, mishandled a gunshot residue kit and carpet sample, and came to conclusions contrary to the physical evidence.

Plaintiff's claims arising from the allegedly incompetent (or even dishonest) investigation of her husband's death fail for lack of a federally guaranteed right.  As noted above, section 1983 allows a civil action for violation of a person's federally guaranteed right to privileges or immunities.  The county investigators simply had no constitutional duty to plaintiff, a family member of a person killed in a police shootout, to conduct a proper investigation of the death of a loved one.  As the Supreme Court has made clear, the Due Process Clause limits government action, but does not impose affirmative duties on state government to provide services to its citizens.  *See DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989).  The Due Process

Clause therefore does not impose upon the states affirmative duties to provide services, such as police protection or investigation. *See Hilton v. City of Wheeling*, 209 F.3d 1005, 1006-07 (7th Cir. 2000).  Consequently, the federal courts hold that there is no constitutional right to a proper investigation after the fact. *See, e.g., Gomez v. Whitney*, 757 F.2d 1005 (9th Cir. 1985); *Roman v. City of Redding, Penn.*, 257 F. Supp. 2d 799 (E.D. Pa. 1993).  Furthermore, even if this court were to find the police investigation had been somehow inadequate, it is unclear what, if any, relief the court could award.  The federal courts do not supervise state officers and are not in a position to oversee their investigative efforts.  Money damages would likewise appear to be unavailing, as plaintiff can in no sense be deemed to have suffered an injury as a result of the allegedly flawed investigation.  Plaintiff has therefore failed to state a claim upon which relief can be granted arising from the allegedly improper investigation.

Plaintiff also asserts that Officer Jako violated her constitutional rights by conducting a taped investigation without first giving her the appropriate *Miranda* warnings.  This claim is frivolous.  *Miranda v. Arizona*, 384 U.S. 436 (1966), established a mechanism to safeguard a defendant's Fifth Amendment privilege against self-incrimination in the context of custodial interrogations. The Supreme Court has made it clear that *Miranda* warnings are only required when a suspect is in custody.  *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990).  Plaintiff has not alleged facts that would lead to a conclusion that she was ever in custody.  Furthermore, *Miranda* secures a trial right against self-incrimination and is enforced by exclusion of non-*Mirandized* statements from evidence.  *See Miranda*, 384 U.S. at 479.  Therefore, no cause of action exists under section 1983 when police officers fail to give *Miranda* warnings but do not seek to introduce the statement. *Jones v. Cannon*, 174 F.3d 1271, 1290 (11th Cir. 1999) (collecting cases); *Gradisher v. County of*

-45-

*Muskegon*, 255 F. Supp. 2d 720, 731 (W.D. Mich. 2003).  Plaintiff was never charged with a crime, nor was her statement ever introduced against her.  Her complaints arising from police questioning therefore raise no constitutional claims.

        C.      <u>Kalamazoo County</u>

The court concludes that plaintiff's complaint fails to state a claim against any of the county defendants.  When a complaint is insufficient to state a claim against municipal employees, it *a fortiori* states no claim against the municipality.  *See City of Los Angeles v. Heller*, 475 U.S. 796 (1986); *Graham v. County of Washtenaw*, 358 F.3d 377, 383 n.4 (6th Cir. 2004); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2002).  The County of Kalamazoo is therefore entitled to dismissal as well.

### **<u>Conclusion</u>**

For the reasons set forth herein, the court will dismiss all claims plaintiff purports to bring in a representative capacity, without prejudice.  Plaintiff's section 1983 claims arising from the death of her husband will be dismissed for failure to state a claim upon which relief can be granted.  The motion to dismiss for lack of subject-matter jurisdiction by the United States Secret Service, and the motion of John Does I and II to dismiss for failure to state a claim (docket # 45) will be granted.  The motion by defendants Kalamazoo County Sheriff's Department, James A. Gregart, Ken Jako, Marty Johnson, and Carrie Klein to dismiss plaintiff's complaint for failure to state a claim (docket # 22) will be granted.  The motion to dismiss by defendants Matthew Scott Barkley, Jack Bogema, Gregory Burke, Michelle Kozminske, and the Portage Police Department (docket #

38) will be granted.  The motion of those defendants for summary judgment will be dismissed as moot.

Date:    March 22, 2004            /s/ Robert Holmes Bell
                                   ROBERT HOLMES BELL
                                   CHIEF UNITED STATES DISTRICT JUDGE